# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

ASHFORD HOSPITALITY PRIME, INC.,

Plaintiff,

-against-

SESSA CAPITAL (MASTER), L.P., SESSA CAPITAL GP, LLC, SESSA CAPITAL IM, L.P., SESSA CAPITAL IM GP, LLC, JOHN E. PETRY, PHILIP B. LIVINGSTON, LAWRENCE A. CUNNINGHAM, DANIEL B. SILVERS and CHRIS D. WHEELER,

Defendants.

No. 16-cv-_____

## COMPLAINT

Plaintiff Ashford Hospitality Prime, Inc. ("Ashford Prime" or the "Company"), by its undersigned attorneys, for its Complaint against Defendants Sessa Capital (Master), L.P. ("Sessa Capital"), Sessa Capital GP, LLC ("Sessa Capital GP"), Sessa Capital IM, L.P. ("Sessa IM") and Sessa Capital IM GP, LLC ("Sessa IM GP") (collectively, "Sessa"), John E. Petry (together with Sessa, the "Sessa Defendants") and Philip B. Livingston, Lawrence A. Cunningham, Daniel B. Silvers and Chris D. Wheeler (collectively, with the Sessa Defendants, "Defendants"), alleges on knowledge as to itself and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.     Ashford Prime seeks declaratory and injunctive relief to prevent Defendants from proceeding with an unfair and illegal proxy contest to seize control of the Board of Directors of Ashford Prime (the "Ashford Prime Board") on the basis of material

misrepresentations and omissions intended to mislead Ashford Prime, its stockholders, and the investing public in violation of the federal securities laws, including Sections 13(d) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ashford Prime is a publicly traded corporation that invests primarily in luxury and upscale hotels in gateway and resort locations.  Sessa, which Defendant Petry founded and manages, consists of a group of privately held hedge funds and affiliates that have taken a position in Ashford Prime on behalf of undisclosed investors.  Although Sessa owns less than ten percent of Ashford Prime stock and has no prior management or operational experience in the hospitality industry, it seeks outright control of Ashford Prime's Board of Directors by capturing five of seven seats on the Board.  Thus, Sessa seeks to trap the Company's stockholders in a partnership without providing those shareholders basic – and legally required – information about who their new controlling partners are or what they plan to do once they obtain control of Ashford Prime.

3.      The Proxy Materials and other documents filed by Sessa recklessly fail to provide critical information required for the Company's stockholders to make informed voting decisions and contain numerous false and misleading statements, as well as material omissions, including by:

- Failing to disclose plans and proposals for Ashford Prime and its assets if they prevail in the proxy contest;

- Failing to disclose the significant economic risks to the Company and its stockholders that may arise from the realization of Defendants' scheme, including by the election of the Purported Nominees to the Ashford Prime Board or the sale of the Company and its assets, including that such events may cause the Company to pay its counterparties hundreds of millions of dollars under the Advisory Agreement and Credit Agreement;

- Falsely stating that the magnitude of the Termination Fee was increased by the Third Amended Advisory Agreement, when, in fact, on any given

day, the magnitude of the Termination Fee as calculated has not been altered by the amendment;

- Falsely claiming that Ashford Prime sold voting stock to holders of a limited partnership for $43,750, when, in fact, Ashford Prime received valuable consideration in the form of amendments to the Partnership Agreement for the sale;

- For several weeks, concealing Defendant Livingston's purchase of approximately $50,000 in shares of Ashford Prime's common stock while possibly in the possession of material, non-public information regarding Sessa's plans for the Company;

- Failing to disclose the formation of a "group" by Sessa and Livingston for purposes of the federal securities laws;

- Making false and materially misleading statements impugning the character, integrity and reputation of Ashford Prime's directors and management (while, at the same time, submitting for election a purported slate of nominees that has raised serious questions, with respect to potential violations of the insider trading laws and resume-padding);

- Failing to disclose that their refusal to comply with the Advance Notice Requirements likely rendered the notice of nomination invalid and that their nominees may lawfully not be permitted to stand for election; and

- Failing to disclose numerous messages posted in a members-only investor forum called the "Value Investors Club" founded and controlled by Defendant Petry.

4.      It is obvious that Sessa planned to intentionally mislead the Company's stockholders into supporting a ruinous plan to strip Ashford Prime of assets and value in order to extract a short-term profit for itself and its own investors.  Sessa hopes to manufacture a short-term – and short-lived – increase in Ashford Prime's stock price or a quick sale of Ashford Prime or its assets so that it can sell out of its position and get a quick profit.  What Sessa has not told the public is that, at a minimum, its plans will create this fleeting increase over current depressed market prices at the expense of long-term stockholder value.  At worst, its plans will trigger hundreds of millions of dollars in liabilities for Ashford Prime and its stockholders and

precipitate costly and unnecessary litigation with Ashford Prime's business partners and creditors.

5.      Defendants' scheme to install Petry and the individual Defendants (Sessa's "Purported Nominees") on the Ashford Prime Board and seize control is being perpetrated through repeated falsehoods and material omissions that appear to be intended to deprive the Ashford Prime Board and Ashford Prime's stockholders of the opportunity to meaningfully evaluate the character and qualifications of the Purported Nominees or the chance to assess the undisclosed plans that Sessa and the Purported Nominees intend to implement with respect to the Company and its assets.

6.      For example, Defendants' filings are devoid of any explanation of Defendants' plans to abandon the Ashford Prime Board's strategic review process in favor of a hasty sales process calculated to benefit the narrow, short-term interests of Defendants without regard to the long-term interests of the Company or its stockholders.  Defendants' undisclosed intention to engage in a rushed sale of the Company without the benefit of a measured process may cost the Company's stockholders tens or hundreds of millions of dollars.  These material omissions violate Sections 13(d) and 14(a) of the Exchange Act.

7.      Defendants also have failed to disclose that the election of their Purported Nominees, and implementation of their secret plans to sell the Company and its assets, may trigger covenants in a credit agreement and an advisory agreement requiring the Company to pay its contractual counterparties hundreds of millions of dollars.  Indeed, Defendants' failure to disclose these material risks suggests that, once in control of Ashford Prime, Defendants may intend to renege on the Company's contractual obligations, thus exposing the Company to potentially massive liability and costly litigation while also undermining the Company's

reputation and hindering its continued ability to access the credit markets.   These material omissions also violate Sections 13(d) and 14(a) of the Exchange Act.

8.    In addition, unbeknownst to the Company's stockholders and the investing public, Defendants' purported slate is invalid because Defendants have refused to provide important information required by, and flatly refuse to comply with, the procedures set forth in the Company's Bylaws.   In what appears to be an intentional attempt to short-circuit any meaningful evaluation of the Purported Nominees by the Ashford Prime Board or Ashford Prime's stockholders, Defendants have stonewalled repeated entreaties for additional information by the Company and the Ashford Prime Board, refusing to provide material information on the basis of, among other things, a supposed "spousal privilege."   In so doing, Defendants have rendered their notice of nomination invalid, and the Company has the power to refuse to permit the Purported Nominees to stand for election at this year's annual meeting.   Nowhere do Defendants disclose to Ashford Prime's stockholders that the Purported Nominees may not be permitted to stand for election at all and that a vote for them may be a nullity.

9.    Sessa's refusal to comply with Ashford Prime's Advance Notice Bylaws or permit the Ashford Prime Board to vet the Purported Nominees as required by its agreements with its creditors and counterparties, moreover, plainly flows from the fact – also concealed from stockholders – that the Purported Nominees are unfit and unprepared to represent the Company's stockholders in Ashford Prime's boardroom.

10.    The limited information that Defendants have provided, and what has been uncovered in the investigation undertaken by the Company, establish multiple significant misstatements relating to the Purported Nominees' trading history and qualifications that raise serious questions about their integrity and Defendants' aims.   For example, Defendants failed to disclose to Ashford Prime that one of its purported nominees, Philip Livingston, purchased

approximately $50,000 worth of Ashford Prime Stock while possibly in possession of material, non-public information relating to Sessa's plans and proposals for the Company and its assets. Defendants' failure to provide even basic documentation with respect to Livingston's trading in Ashford Prime's stock raises serious questions as to potential violations of the insider trading laws. The investigation also has revealed that Livingston appears to be guilty of resume-padding by falsely claiming that he is currently a Certified Public Accountant.

11.     Making matters worse, Plaintiffs' believe Defendants have failed to disclose that they formed a "group" for purposes of Section 13(d) despite collectively acquiring 2,334,726 shares, representing more than 8.2% of the Ashford Prime's outstanding stock. This, too, violates Ashford Prime's Bylaws.

12.     As a result of Defendants' failure to comply with the federal securities laws and the Company's Bylaws, the Ashford Prime Board and the Company's stockholders have been deprived of the information necessary to evaluate the suitability of the Purported Nominees or the aims of Sessa's campaign. Defendants should not be granted an unfair advantage in their efforts to seize control of the Ashford Prime Board and must be subject to the same rules applicable to all potential candidates to serve on a board of directors under the federal securities laws.

## THE PARTIES

13.     Plaintiff Ashford Hospitality Prime, Inc. ("Ashford Prime") is a publicly traded Maryland corporation with a principal place of business at 14185 Dallas Parkway, Suite 1100, Dallas, Texas 75254. Ashford Prime has elected to be taxed as a REIT under the Internal Revenue Code. Ashford Prime does not have any dedicated employees and is run and operated by Ashford LLC and Ashford Inc.

14.     Non-party Ashford Hospitality Prime Limited Partnership (the "Ashford Operating Partnership") is the entity through which Ashford Prime conducts its business and owns substantially all of its assets.   Ashford Prime, through its wholly owned subsidiary, Ashford Prime OP General Partner LLC, is the general partner of Ashford Operating Partnership.

15.     Non-party Ashford Hospitality Advisors LLC ("Ashford LLC") is a limited liability company organized under the laws of Delaware.   Non-party Ashford Inc. is a publicly traded Delaware corporation and is the parent company of Ashford LLC.   Together, Ashford LLC and Ashford Inc. manage and operate Ashford Prime pursuant to the advisory agreement between Ashford Prime, the Ashford Operating Partnership, Ashford Prime TRS Corporation, Ashford Inc. and Ashford LLC, dated as of November 19, 2013 and amended and restated on May 13, 2014, November 3, 2014 and June 10, 2015 (the "Advisory Agreement").[1]

16.     Defendant Sessa Capital (Master), L.P. ("Sessa Capital") is a Cayman Islands exempted limited partnership with a principal place of business at 1350 Avenue of the Americas, Suite 3110, New York, New York 10019.   Sessa Capital GP, LLC, ("Sessa Capital GP"), is the sole general partner of Sessa Capital.   Sessa Capital IM, L.P. ("Sessa IM") is the investment adviser for Sessa Capital.   Sessa IM GP, LLC ("Sessa IM GP") is the sole general partner of Sessa IM.

17.     Defendant Sessa Capital GP is a Delaware limited liability company with a principal place of business at 1350 Avenue of the Americas, Suite 3110, New York, New York 10019.

18.     Defendant Sessa IM is a Delaware limited partnership with a principal place of business at 1350 Avenue of the Americas, Suite 3110, New York, New York 10019.

---

[1] Ashford Inc. was spun off from Ashford Trust on November 13, 2014 and entered into the Advisory Agreement on June 10, 2015.

19.     Defendant Sessa IM GP is a Delaware limited liability company with a principal place of business at 1350 Avenue of the Americas, Suite 3110, New York, New York 10019.

20.     Defendant John E. Petry resides at 275 Central Park West, Apartment 13C, New York, New York 10024.  Defendant Petry is the founder of Sessa Capital and its managing partner.  Defendant Petry also is the manager of Sessa Capital GP and Sessa IM GP. Defendant Petry is a Purported Nominee to the Ashford Prime Board.

21.     Defendant Philip B. Livingston resides at 7145 Cedarwood Circle, Boulder, Colorado 80301.  Defendant Livingston is a Purported Nominee to the Ashford Prime Board.

22.     Defendant Lawrence A. Cunningham resides at 115 E 9th Street, Apartment 10A, New York, New York  10003.  Defendant Cunningham is a Purported Nominee to the Ashford Prime Board.

23.     Defendant Daniel B. Silvers resides at 1199 Park Avenue, Apartment 17A, New York, New York 10128.  Defendant Silvers is a Purported Nominee to the Ashford Prime Board.

24.     Defendant Chris D. Wheeler resides at 2701 NE 42nd Street, Lighthouse Point, Florida  33064.  Defendant Wheeler is a Purported Nominee to the Ashford Prime Board.

## JURISDICTION AND VENUE

25.     This action arises under Sections 13(d) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m(d), 78n(a), and rules and regulations promulgated thereunder.

26.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, because various acts or transactions constituting the offenses herein occurred within the Northern District of Texas.  Among other

things, Defendants' misleading proxy solicitation materials were (i) transmitted to and received by Ashford Prime, whose headquarters and principal place of business is in this District, and (ii) filed with the U.S. Securities and Exchange Commission ("SEC") in anticipation and for the purpose of their distribution to Ashford Prime's stockholders, including stockholders located within this District, in order to obtain proxies to be used at Ashford Prime's annual stockholders meeting intended to be held in this District.

27.     This court has jurisdiction over the subject matter of this action based on 28 U.S.C. § 1331 and Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa.

## FACTUAL BACKGROUND

### I.      Ashford Prime And The Advisory Agreement

28.     On November 19, 2013, Ashford Prime was spun off from Ashford Trust as a public company through the distribution of Ashford Prime's outstanding common stock to stockholders of Ashford Trust.

29.     Also on November 19, 2013, Ashford Prime entered into the Advisory Agreement with Ashford LLC.  Pursuant to the Advisory Agreement, Ashford LLC and, under a subsequent amendment, Ashford Inc., manage and operate Ashford Prime, including by (i) acting as Ashford Prime's advisor, (ii) implementing Ashford Prime's investment, strategies and decisions, (iii) managing Ashford Prime's day-to-day operations, subject to the supervision and oversight of the Ashford Prime Board, and (iv) providing and obtaining, on behalf of Ashford Prime, the personnel and services necessary for Ashford Prime to conduct its business.

30.     The Advisory Agreement has (and always had) included a right to terminate the Advisory Agreement and receive a termination fee (the "Termination Fee") upon the occurrence of certain events that constitute a "Company Change of Control."

31.     The Advisory Agreement has been amended three times, including on or about May 13, 2014, November 3, 2014, and June 10, 2015.  On each occasion, the amendments were evaluated and approved by the independent directors of the Ashford Prime Board.  The terms of each of the amendments were publicly disclosed and made available to the Company's stockholders and the investing public.  *See* Ashford Prime Form 8-K, filed May 14, 2014; Ashford Prime Form 10-Q, filed Nov. 7, 2014, Ex. 10.1; Ashford Prime Form 8-K, filed June 12, 2015.  These amendments, and the existence of the Advisory Agreement and its terms, were publicly known and known to Defendants at all times that they invested in Ashford Prime.

32.     Among other things, the most recent amendment, memorialized on June 10, 2015 as the third amended and restated Advisory Agreement with Ashford Hospitality Prime Limited Partnership, Ashford Prime TRS Corporation, Ashford Inc., and Ashford LLC (the "Third Amended Advisory Agreement"):  (i) clarifies the calculation of the Termination Fee (but does not alter the magnitude of the Termination Fee, as on any given day, the magnitude of the Termination Fee as calculated under the amendment would be the same as calculated under previous amendments); and (ii) modifies the definition of "Company Change of Control" to include a change in the composition of the majority of the directors of the Ashford Prime Board. Critically, the Third Amended Advisory Agreement provides the incumbent Ashford Prime Board with the discretion to evaluate and approve properly vetted and qualified director nominees as "continuing directors."   Upon such a determination by the incumbent Board, a Company Change of Control does not occur and the Termination Fee is not triggered.

## II.   Defendants' Coordinated Accumulation Of An Activist Position In Ashford Prime

33.     Section 13(d) of the Exchange Act was enacted to prevent the rapid secret accumulation of stock in a publicly traded company and to alert stockholders when someone is seeking control of a company.

34.     In this regard, Section 13(d) of the Exchange Act provides that:

> any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of [a publicly traded company] is directly or indirectly the beneficial owner of more than five percent of the class shall, within ten days after such acquisition …file with the [SEC] a [Schedule 13D].

15 U.S.C. §78m(d).

35.     In order to prevent an activist like Sessa from secretly warehousing shares in friendly hands, the Exchange Act and the rules enacted by the SEC require the disclosure of all members of a group of investors acting in concert.  Under the rules, nominees in a proxy contest who buy shares are a part of the group and they must be included on Schedule 13D and their holdings must also be disclosed.

36.     Between March 2015 and January 2016, Defendants purchased 2,334,726 shares of Ashford Prime common stock, making Sessa the direct or beneficial owner of 8.2% of the Company's outstanding common stock.

37.     On September 2, 2015, Sessa filed with the SEC a Schedule 13D ("Sept. 2, 2015 Sch. 13D"), disclosing its ownership of 2,060,207 shares of Ashford Prime common stock, constituting 7.2% of the outstanding common stock.

38.     On December 11, 2015, Sessa filed with the SEC an amendment to its Schedule 13D ("Dec. 11, 2015 Sch. 13D/A"), disclosing ownership of 2,330,726 shares of Ashford Prime common stock, constituting 8.2% of the outstanding common stock.

39.     On January 15, 2016, Sessa filed with the SEC an amendment to its Schedule 13D ("Jan. 15, 2016 Sch. 13D/A") and soliciting materials under Rule 14a-12 on Schedule 14A ("Jan. 15, 2016 DEFN14A"), again listing Sessa as the owner of 8.2% of Ashford Prime common stock.

40.     In January 2016, after being put forth as a Purported Nominee by Sessa, Defendant Livingston purchased 4,000 shares of Ashford Prime's common stock.  Defendants never amended their Schedule 13D to disclose Livingston's secret purchase of Ashford Prime stock, and did not even disclose the purchase until it filed solicitation materials under Rule 14a-12 on February 4, 2016.  Even then Sessa only disclosed this material information in the last sentence of the legend affixed to the DEFN14A (or, in other words, the fine print).

41.     As set forth in more detail below, Livingston's purchase of Ashford Prime stock, while presumably in possession of Sessa's undisclosed proposals and plans for the Company and its assets, raises serious questions as to potential violations of the insider trading laws.

42.     Equally confounding, despite collectively accumulating a large position in the Company's stock, Defendants still disclaim in Sessa's Section 13(d) disclosures on Schedule 13D to the Company, its stockholders and the investing public that they have formed and are acting as a group.

## III.   Ashford Prime Announces The Commencement Of The Strategic Review

43.     On August 28, 2015, Ashford Prime announced that the independent directors of the Ashford Prime Board decided to conduct a strategic review to explore a full range of strategic alternatives, including a possible sale of Ashford Prime (the "Strategic Review").   In connection with the Strategic Review, the independent directors retained sophisticated legal and financial advisors.

44.     The Strategic Review is and was intended to be a careful and measured process that would consider whether it was in the interests of all of Ashford Prime's stockholders to remain independent, sell the Company or some of its assets, merge with or purchase other companies or provide value or liquidity to Ashford's stockholders or pursue other alternatives. Since August 2015, the Ashford Prime Board has conducted a thorough and deliberative process with management and its legal and financial advisors to consider all available options.

IV.     **Ashford Prime Engages The Sessa Defendants**

45.     Between June 10, 2015 and January 2016, Ashford Prime's management and certain members of the Ashford Prime Board met with the Sessa Defendants, including Defendant Petry, on multiple occasions to discuss Ashford Prime's long-term interests and the amendments to its Advisory Agreement.

46.     In these discussions, the Sessa Defendants refused to meaningfully engage the Company in a discussion of the long-term interests of the Company and its stockholders.

47.     Instead, the Sessa Defendants repeatedly urged that Ashford Prime short-circuit the Strategic Review and commence a hasty, fire-sale process in furtherance of the Sessa' Defendants' short-term interests.

48.     In addition, the Sessa Defendants repeatedly demanded that Ashford Prime renegotiate its Advisory Agreement with Ashford Inc. to reduce or eliminate the Termination Fee.  Despite repeated requests, the Sessa Defendants refused to identify any consideration that they believed could be offered by Ashford Prime to Ashford Inc. and essentially demanded that Ashford Prime somehow repudiate the Termination Fee or obtain its reduction or elimination in exchange for no consideration.

**V.    Defendants Purport To Submit A Slate Of Purported Nominees Yet Refuse To Abide By The Company's Advance Notice Requirements In The Bylaws**

49.    Article I, Section 11 of the Ashford Prime amended and restated bylaws, dated November 5, 2013 (the "Advance Notice Requirements") governs the procedure and requirements for stockholder nominations of individuals for election to the Ashford Prime Board at an annual meeting of stockholders, including with respect to timeliness and the information that must be provided in order for such individuals to be eligible for nomination for election by stockholders as directors.

50.    Ashford Prime, like many other publicly-traded U.S. corporations, has adopted the Advance Notice Requirements to ensure that persons who seek to run a proxy contest to elect themselves or their designees to the Board of Directors provide to Ashford Prime and its stockholders well in advance of any election detailed information concerning their proposed slate of directors, including their background and qualifications, their investment, if any, in Ashford Prime and what they plan to do if elected. Much of this information is also required by federal proxy rules; all of it bears directly on whether a nominee or his or her backer will be a fit representative of the stockholders.

51.    The Advance Notice Requirements provide that the information must be provided to the Company far enough in advance of the annual meeting to allow the Company to review and confirm the qualifications of such nominees.  Failure to comply with the Advance Notice Requirements thwarts this purpose and renders any such notice of intent to nominate invalid.  Where, as here, an investor refuses to abide by the Advance Notice Requirements, the Company may lawfully refuse to permit its Purported Nominees to stand for election at the annual meeting.

52.     Under the Advance Notice Requirements, stockholder nominations must be received by the Company not less than 90 days and not more than 120 days prior to the first anniversary of the date of the proxy statement for the preceding year's annual meeting.

53.     The 2015 Annual meeting was held on May 12, 2015.  Thus, the period during which stockholders could deliver a notice of nominations for the 2016 annual meeting ran from December 19, 2015 to January 18, 2016.

54.     Defendants waited almost until the eve of that deadline, January 15, 2016, to notify Ashford Prime that Defendants intended to nominate the Purported Nominees for election to the Ashford Prime Board and provide partially completed questionnaires for each Purported Nominee (the "Nomination Materials").  Incredibly, Defendants purported to impose a deadline of February 1, 2016 for the Ashford Prime Board to "approve" the Purported Nominees and without full information deem them "continuing directors" under the Advisory Agreement, thereby preventing the occurrence of a Company Change Of Control and precluding the triggering of the Termination Fee.  Defendants' demand is all the more incredible considering their refusal to provide the information required or the time necessary to make this evaluation.

55.     The Advance Notice Requirements require nominating stockholders (each, a "Nominating Stockholder") to provide, with respect to each Purported Nominee, all information relating to the Purported Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Purported Nominee as a director in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Exchange Act and the rules promulgated thereunder."  Bylaws, Art. I, Sec. 11(a)(3)(i).

56.     The Advance Notice Requirements require, as to (i) the Nominating Stockholder, (ii) any Purported Nominee and (iii) any beneficial owner of shares of stock of the Company owned of record or beneficially by such stockholder (other than a stockholder that is a depositary), affiliate or person acting in concert with the Nominating Stockholder (a "Stockholder Associated Person"), the following information: the class, series and number of all shares of Ashford Prime securities owned by the Nominating Stockholder, any Purported Nominee or Stockholder Associated Person, as well as the date on which such securities were acquired and the investment intent of such acquisition.  Bylaws, Art. I, Sec. 11(a)(3)(iii)(A).

57.     The Advance Notice Requirements obligate Nominating Stockholders to provide, with respect to each Purported Nominee, (i) a certificate executed by the Purported Nominees certifying that such Purported Nominee (a) is not, and will not become, a party to any agreement, arrangement or understanding with any person or entity other than Ashford Prime in connection with service or action as a director that has not been disclosed to the Company and (b) will serve as a director of the Company if elected and (ii) a completed questionnaire in the form provided by the Company that includes "all information relating to the Purported Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Purported Nominee as a director in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Exchange Act and the rules promulgated thereunder." Bylaws, Art. I, Sec. 11(4).

58.     The Advance Notice Requirements also require Nominating Stockholders to comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations promulgated thereunder with respect to the Advance Notice Requirements.

59.     The Advance Notice Requirements further require Nominating Stockholders to provide the name and address of any person who contacted or was contacted by the Nominating Stockholder or any Stockholder Associated Person about a Purported Nominee or other business proposal prior to such stockholder's notice. Bylaws, Art. I, Sec. 11(a)(3)(vi).

60.     Moreover, the Advance Notice Requirements provide that if any information submitted by a Nominating Stockholder is inaccurate in any material respect, such information may be deemed not to have been provided in accordance with the Advance Notice Requirements.

61.     The Advance Notice Requirements also impose an obligation on Nominating Stockholders to notify the Company of any inaccuracy or material change within two business days of becoming aware of such inaccuracy or material change, and further provide that failure to provide such update shall cause the related information to be deemed not to have been provided in accordance with the Advance Notice Requirements. Bylaws, Art. I, Sec. 11(c)(1).

62.     On January 26, 2016, the Company identified to Defendants numerous material inaccuracies and deficiencies in the Nomination Materials.  Notwithstanding that Defendants' Nomination Materials were in violation of the Bylaws, the Company provided Defendants with an opportunity to cure such deficiencies.  Among other things, the Nomination Materials failed to disclose (i) all information required under the Exchange Act and (ii) all information relating to the Purported Nominees that would be required to be disclosed in connection with the solicitation of proxies for the election of the Purported Nominees as a director in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Exchange Act and the rules promulgated thereunder.

63.     The Nomination Materials also contained false and misleading statements that raise serious questions about the Purported Nominees' qualifications.  For example, in his Director Questionnaire, Livingston held himself out to be a Certified Public Accountant ("CPA").   On information and belief, this statement appears to be false because Defendant Livingston is not in fact a CPA.  Livingston's license appears to have expired in 2004 and was cancelled in 2009 by the California Board of Accountancy.

64.     Defendants also violated the Advance Notice Requirements by failing to notify the Company, and within two business days, update the Nominating Materials, to disclose Defendant Livingston's purchase of 4,000 shares of Ashford Prime stock in January 2016.

65.     Defendants failed to meaningfully respond to the Company's request that they cure the deficiencies in the Nomination Materials in order to comply with the Advance Notice Requirements.  On February 3, 2016, Defendant Petry sent a letter to the Chair of the Nominating and Corporate Governance Committee of the Board that failed to provide the vast majority of the material information missing from the Nomination Materials.   Defendants justified their refusal to provide the missing information and noncompliance with the Advance Notice Requirements, in part, on the basis of a purported "spousal" privilege.

66.     Notwithstanding Defendants' untimeliness and refusal to provide the information required by the Advance Notice Requirements, on February 4, 2016, the Company continued to engage Defendants and requested to meet with each of the Purported Nominees in order to obtain the information necessary to properly evaluate their candidacies as required by the Company's Credit Agreement and the Advisory Agreement.  In response, on February 11, 2016, Defendants refused to make the Purported Nominees available for interviews and speciously demanded that the current directors of the Ashford Prime Board complete director questionnaires for review by Sessa.

67.     Defendants failed to comply with the Advance Notice Requirements by failing to provide material information and comply with the rules and requirements of the Exchange Act, including Regulation 14A.  Defendants have also failed to comply with the Advance Notice Requirements by failing to notify the Company of numerous deficiencies and inaccuracies in the Nomination Materials.

68.     Accordingly, the notice of nomination of the Purported Nominees is invalid under the Company's Bylaws, and thus under Maryland law the Company is under no obligation to submit the Purported Nominees for election at the 2016 annual meeting. Nevertheless, the Defendants' Preliminary Proxy Materials mislead stockholders by creating the false impression that stockholders will have the ability to vote for the Purported Nominees when in fact such a vote could have the same effect as an abstention or non-vote.

## VI.     Sessa Commences The Maryland Litigation

69.     In another tactic calculated to bully the Ashford Prime Board and evade the evaluation process, Sessa filed a lawsuit in Maryland state court on February 3, 2016 against Ashford Prime, the Ashford Prime Board, Ashford Inc. and Ashford LLC (the "Maryland Action").  In the Maryland Action, Sessa improperly seeks to have the court invalidate the Termination Fee and order the Board to approve the Purported Nominees.  Notably, Sessa's campaign to declare the Termination Fee invalid is belied by the terms of the Third Amended Advisory Agreement and the facts that (i) the Termination Fee has been in place at all times during the life of Ashford Prime, and (ii) Defendants accumulated 57% of their position after the Company entered into the Third Amended Advisory Agreement.

## VII.    Defendants' Proxy Materials Violate Section 14(a) Of The Exchange Act

70.     As described below, Defendants have violated Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 14a-9 and

Rule 14a-101, by filing false and misleading proxy solicitation materials, including: the Preliminary Proxy Statement on Schedule 14A, filed on February 12, 2016 (the "Preliminary Proxy Statement") (attached hereto as Exhibit 1), and soliciting materials filed pursuant to Rule 14a-12, including DEFN14A, filed on January 15, 2016 (attached hereto as Exhibit 2), DEFN14A, filed on February 2, 2016 ("Feb. 2, 2016 DEFN 14A") (attached hereto as Exhibit 3), DEFN14A, filed on February 4, 2016 ("Feb. 4, 2016 DEFN14A") (attached hereto as Exhibit 4), and DEFN14A, filed on Feb. 17, 2016 ("Feb. 17, 2016 DEFN14A") (attached hereto as Exhibit 5) (the "Proxy Materials").

71.   The purpose of Section 14(a) is to protect stockholders by making it unlawful to obtain authorization for corporate action by means of deceptive or inadequate disclosure in a proxy solicitation.

72.   Rule 14a-9, in turn, prohibits the filing by a nominating stockholder of any proxy material that contains "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

73.   In addition, Rule 14a-101 requires the nominating stockholders to disclose their plans with respect to transactions that it intends to cause the company to enter into.  In particular, Item 5(b)(1)(xii) of Rule 14a-101 requires the disclosure of "any arrangement or understanding . . . "with respect to any future transactions to which the registrant or any of its affiliates will or may be a party."

74.   As set forth below, the Proxy Materials have deprived and continue to deprive the Company's stockholders of the information that they require to properly evaluate the qualifications and integrity of Defendants' slate of Purported Nominees, and Defendants' plans

and proposals for the Company and its assets, because each of the filings contains numerous false and misleading statements and material omissions.

75.    In particular, Defendants:

- failed to disclose their plans and proposals for Ashford Prime and its assets if they prevail in the proxy contest,

- failed to disclose the significant economic risks to the Company and its stockholders that may arise from the realization of Defendants' scheme, including by the election of the Purported Nominees to the Ashford Prime Board or the sale of the Company and its assets, including that such events may cause the Company to pay its counterparties hundreds of millions of dollars under the Advisory Agreement and Credit Agreement,

- falsely stated that the magnitude of the Termination Fee was increased by the Third Amended Advisory Agreement, when, in fact, on any given day, the magnitude of the Termination Fee as calculated has not been altered by the amendment

- falsely claimed that Ashford Prime sold voting stock to holders of a limited partnership for $43,750, when, in fact, Ashford Prime received valuable consideration in the form of amendments to the Partnership Agreement for the sale,

- for several weeks, concealed Defendant Livingston's purchase of approximately $50,000 in shares of Ashford Prime's common stock,

- makes false and materially misleading statements impugning the character, integrity and reputation of Ashford Prime's directors and management, and

- failed to disclose that their refusal to comply with the Advance Notice Requirements likely rendered the notice of nomination invalid and that their nominees may lawfully not be permitted to stand for election.

**A.    Defendants' Failure To Disclose Their Plans And Proposals For Ashford Prime**

76.    In furtherance of their scheme to take control of the Company, the Proxy Materials conspicuously omit Defendants' plan to abandon the Strategic Review in favor of a hasty sale of the Company and its assets.  Indeed, Defendants have not identified any plans or

proposals that they have for Ashford Prime. Defendants' failure to disclose such plans and proposals violates Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, including Rule 14a-9.

77. The Proxy Materials fail to provide any information regarding Defendants' plans to effect a sale of Ashford Prime, including the identities of persons that they have contacted and their proposal for addressing the payment of the Termination Fee that would arise if all five of the Purported Nominees were elected to the Ashford Board or if Ashford Prime was sold.

78. In particular, Sessa's Proxy Materials fail to: (i) describe any plans or proposals which relate to or would result in an extraordinary corporate transaction, such as a merger, reorganization or liquidation of Ashford Prime; (ii) describe any plans or proposals which relate to the sale or transfer of a material amount of assets of Ashford Prime; and (iii) disclose whether or not any Defendant has any arrangement or understanding with any person with respect to any future transactions to which Sessa will or may be a party.

79. Defendants' failure to disclose such material information effectively precludes Ashford Prime's stockholders from making an informed voting decision with respect to the Purported Nominees.

**B. Defendants' Failure To Disclose Material Risks Related To A Change Of Control**

80. The Proxy Materials conspicuously omit any discussion of the significant economic risks posed to the Company and its stockholders by the election of the Purported Nominees and the realization of Defendants' secret scheme to hastily sell the Company and its assets. Under both (i) a credit agreement, dated as of November 19, 2013, that provides a $150 million revolving credit facility to Ashford Prime (the "Credit Agreement") and (ii) the Advisory

Agreement, the election of the Purported Nominees and sale of the Company and its assets may constitute a Change of Control, immediately incurring liability in the hundreds of millions of dollars for the Company.

81.     Defendants' failure to disclose these consequences and risks violates Rule 14a-9.

82.     The Credit Agreement provides Ashford Prime with a three-year, $150 million secured revolving credit facility, providing Ashford Prime financial flexibility to fund future acquisitions and hotel redevelopments.  The revolving credit facility is provided to Ashford Operating Partnership, as the borrower, by a syndicate of financial institutions with Bank of America, N.A. serving as the administrative agent (the "Administrative Agent").  Ashford Prime and certain of its subsidiaries guarantee the revolving credit facility.

83.     Under the Credit Agreement, the election of a majority of nominees not approved as "continuing directors" by the incumbent Board constitutes a Change of Control, which is an Event of Default under the Credit Agreement.  *See* Credit Agreement at 83.  Upon the occurrence of an Event of Default, the Administrative Agent may with the consent of certain lenders accelerate the entirety of any outstanding debt or require Ashford Prime's subsidiary, Ashford Operating Partnership, to provide additional cash collateral.  *Id.* at 84.  This risk is not disclosed in the Proxy Materials.  If there is an event of default will have an adverse effect on the Ashford Prime's ability to raise capital going forward.

84.     Similarly, under the Advisory Agreement, the election of the Purported Nominees may constitute a Company Change of Control entitling Ashford LLC and Ashford Inc. to terminate the Advisory Agreement and demand the immediate payment of the Termination Fee.  This, too, is not disclosed in the Proxy Materials.

### C.     Defendants' Misleading And Unsubstantiated Statements Regarding The Termination Fee

85.     The Proxy Materials repeatedly and falsely state that the amendments to the Advisory Agreement have increased the magnitude of the Termination Fee.  Defendants' misleading statements regarding the Termination Fee violate Rule 14a-9.

86.     In particular, the Proxy Materials falsely state:

- "Rather than use the three separate renegotiations of the [Advisory Agreement] in the past two years to fix the problems relating to the fee, the Company's Board appears to have conceded to amendments which, as a whole, have significantly broadened and worsened the fee – to the Company's detriment and to Ashford Inc.'s benefit."  *See* Jan. 15, 2016 DEFN14A; Jan. 15, 2016 Sch. 13D/A.

- "On May 13, 2014, November 3, 2014 and again on June 10, 2015, Ashford Prime amended and restated its [Advisory Agreement]  with AINC. While the initial [Advisory Agreement] was entered into in connection with the 2013 spin-off of [Ashford Prime] from Ashford Hospitality Trust, Inc., the amendments the current Board approved to the termination fee serve to increase its size and apply it in more circumstances than the initial agreement."   *See* Preliminary Proxy Statement at 3.

87.     Yet, as discussed above, the June 10, 2015 Third Amended Advisory Agreement clarified certain contractual provisions governing the calculation of the Termination Fee.  The magnitude of the Termination Fee did not change as calculated on any given date as the magnitude of such fee remains the same as would have been payable under the Advisory Agreement throughout 2015, including prior to the June 2015 amendments.

88.     In this regard, the Company has made clear that the size of the Termination Fee did not change.  For example, on October 20, 2015, Ashford Prime's Chairman and CEO, Montgomery Bennett, stated "remember that this recent modification didn't change the fee, it just attempted to clarify it."   *See* Ashford Prime's Chairman and CEO Monty J. Bennett at Ashford Prime's Analyst-Investor Day, dated Oct. 20, 2015.

### D.   Defendants' False And Misleading Statements Regarding The Consideration Paid In Exchange For Ashford Prime's Series C Preferred Stock

89.     Defendants have made false and misleading statements that Ashford Prime sold voting stock to holders of OP Units solely in exchange for consideration of $0.01 per share, or $43,750 in violation of Rule 14a-9.

90.     On February 2, 2016, Ashford Prime amended the Partnership Agreement with Ashford Operating Partnership (the "Partnership Agreement Amendments"), and provided holders of limited partnership units in Ashford Operating Partnership ("OP Units") the right to acquire shares of Ashford Prime's Series C Preferred Stock.

91.     In exchange for providing holders of OP Units the right to acquire shares of Series C Preferred Stock, Ashford Prime (as general partner of Ashford Operating Partnership) received valuable consideration in the form of favorable Partnership Agreement Amendments, which broadened Ashford Prime's rights in several important ways.

92.     Among other enhancements: (i) the rights of Ashford Prime, as general partner, to indemnification and advancement of expenses were broadened; (ii) additional requirements were added in order for the limited partners to redeem their OP units; (iii) the requisite percentage required for the limited partners to call a special meeting of the partnership was increased; (iv) Ashford Prime, as general partner, was granted additional time to obtain necessary approvals for issuing shares of common stock following a redemption of OP Units; and (v) the consent rights of the limited partners were revised to shorten the notice period for objections to requests from Ashford Prime, as general partner, to twenty days from such requests.

93.     The Series C Preferred Stock allows its holders to vote on matters brought before stockholders of Ashford Prime on a one-for-one as-converted basis without the potential

negative tax effects of converting the OP Units to common stock.  Thus, in addition to the various benefits granted to Ashford Prime, the issuance of the Series C Preferred Stock is consistent with Ashford Prime's governance principle of aligning economic and voting interests.

94.     While the holders of the OP Units have the same economic rights as holders of Ashford Prime's common stock, unless OP Unit holders exercise their right to convert the OP Units into shares of common stock, the OP Unit holders would not otherwise have the right to vote on matters submitted to Ashford Prime's stockholders.  The issuance of Series C Preferred Stock to holders of the OP Units provides them with a tax-efficient right to vote that was previously absent which impaired the alignment of economic and voting rights.  The holders of the Series C Preferred Stock will not be bound by any agreement to vote in any particular manner.

95.     Moreover, contrary to Defendants' false and misleading statements, the OP Unit holders already had the right to redeem shares of Ashford Prime's common stock in exchange for their OP Units.  Under the Partnership Agreement Amendments, shares of the Series C Preferred Stock are automatically redeemed if a limited partner: (i) exercises such redemption right, (ii) forfeits its OP Units or otherwise disposes of them, or (iii) transfers any OP Units without the approval of Ashford Prime, as general partner.  As such, the Series C Preferred Stock does not dilute the voting power of existing stockholders when considered on an after exercise basis as it should be.

**E.     Defendants' False and Misleading Statements Regarding the Conduct of Ashford Prime's Management and Board**

96.     Defendants have also violated Rule 14a-9 by making materially false and unsupported claims impugning the character, integrity and reputation of Ashford Prime's directors and Board.

97.     In this regard, the Notes to Rule 14a-9 define misleading statements under Rule 14a-9 to include "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation."

98.     Here, the Proxy Materials falsely state:

- "The need for new, highly-qualified directors, who will uphold their fiduciary duty and act in the interest of all shareholders, not just Mr. Bennett, has never been greater."  DEFN14A filed February 2, 2016.

- "We are soliciting your support to elect our Nominees at the Annual Meeting because we have little confidence that AHP's Board, as currently composed, has the objectivity and commitment to take the steps necessary to enhance stockholder value."   Preliminary Proxy Statement filed February 12, 2016.

- "We believe that the conflicts of interest and decisions by AHP's directors discussed above show that the current Board is not sufficiently devoted to the best interest of stockholders."   Preliminary Proxy Statement filed February 12, 2016.

- "The Nominees recognize that as members of the Board they will owe fiduciary duties to ALL of the Company's stockholders."   Preliminary Proxy Statement filed February 12, 2016.

- "Sessa Capital has filed suit against the Company, the Company's directors, AINC and Ashford Hospitality Advisors LLC seeking rulings that the directors of the Company breached their fiduciary duties by inserting the Proxy Penalty into the Company's advisory agreement with AINC . . . . [and] seek[ ] an injunction  prohibiting AHP from paying a termination fee triggered by stockholders choosing to elect new directors constituting a majority of the AHP Board."  Preliminary Proxy Statement filed February 12, 2016 at 4. ).

99.     Further, the Value Investors Club website operated by defendant Petry (which constitutes solicitation materials (*see infra* Point VII.G)), contains the following statements that impugns the character, integrity or personal reputation of Ashford Prime's management and Board:

- "I think they generated some negative goodwill certainly through how they structured the AINC spin and then basically bought every share they could get their hands on up to the low hundreds. And I'm sure there is other self-dealing that we could find without looking too hard."  VIC comment, dated July 30, 2015.

- "Nobody told me this but a little bit of logic says they can probably cut some of Remington's costs through 'synergies'. Might not be gigantic but if they did roughly $57M in revenue in 2014 and it is 50% margin we know there is $28.5M in cost...hell Monty may have been paying himself over there too."  VIC comment, dated September 18, 2015.

- "They've put their eggs into the AINC basket full-on so it's hard to imagine they would want to be using completely fraudulent numbers." VIC comment, dated September 18, 2015.

100.    These statements accuse, without any factual support, Ashford Prime's management and directors of improperly managing the company and violating their fiduciary duties, and therefore improperly impugn the character, integrity or personal reputation of members of Ashford Prime's management and Board.

101.    In addition, the Proxy Materials' statement regarding the lawsuit improperly suggests that the election of anyone other than Ashford Prime's incumbent directors will trigger the management fee payment.   Contrary to Defendants' false and misleading statements, under the Advisory Agreement, the Ashford Prime's Board has the option to designate non-incumbent nominees as continuing directors following the Ashford Prime Board's consideration of the qualifications of any proposed nominees.  To date, Sessa has refused to meet with the Ashford Prime Board or provide full information regarding the qualifications of its Purported Nominees.

**F.      Defendants Failed To Disclose Livingston's Purchase Of Ashford Prime Common Stock**

102.    Defendants' failure to disclose Livingston's purchase of Ashford Prime stock in their solicitation materials filed prior to the belated disclosure in the Preliminary Proxy Statement violates Rules 14a-3 and 14a-12.

103.    Rule 14a-3 requires that each person solicited shall be concurrently or previously furnished with a publicly-filed preliminary proxy or definitive proxy statement containing the information specified in Schedule 14A.  Item 5(b)(1) of Schedule 14A requires the disclosure, with respect to any nominee for whose election as a director proxies are solicited, of "any substantial interest, direct or indirect, by security holdings or otherwise." 17 C.F.R. § 240.14a-101.

104.    Under Rule 14a-12, a nominating stockholder must provide with respect to each member of the nominating stockholder group, "a description of their direct or indirect interests, by security holdings or otherwise, or a prominent legend in clear, plain language advising security holders where they can obtain that information."
17 C.F.R. § 240.14a-12.

105.    Defendant's inexplicable delay in disclosing Livingston's purchase of Ashford Prime Stock thus violates Rules 14a-3 and 14a-12.

106.    In addition, Defendants' improper delay in disclosing Livingston's purchase of Ashford Prime Stock only amplifies the serious questions relating to potential violations of the insiders trading laws presented by such purchases.

### G.  Defendant Failed to Disclose Solicitation Materials Relating to Petry's Private Investment Club

107.   Defendant Petry founded and controls a members-only investor forum called the "Value Investors Club," which Petry operates through the    website www.valueinvestorsclub.com.

108.   On information and belief, Petry maintains editorial control over all content posted on the forum and approves all members.  Petry has stated that his Club's members include "a lot of very well-known money managers" and "very, very successful hedge-fund managers."  *See* John    Petry    Interview,    dated    May    2,    2012,    available    at http://www.businessinsider.com/value-investors-club-2012-4.

109.   According to Petry's website, the Value Investors Club enables collusion regarding purchase and sale of securities.

110.   Indeed, Petry's website discloses that:

> "[C]ertain [Value Investors Club] affiliates are engaged in stock and securities trading and investment and investment management. These funds and trusts may have positions (either long or short) in the securities of companies recommended or profiled or otherwise mentioned on and in Valueinvestorsclub.com, or may be bought or sold following, or as a result of, recommendations, analysis or information    submitted    to,    or    contained    in, Valueinvestorsclub.com."

*See* http://www.valueinvestorsclub.com/help/terms.

111.   The members of Petry's Club have posted numerous messages on his forum regarding Ashford Prime.  According to guidance from the SEC staff, all such information constitutes solicitation materials under Rule 14a-12 and should have been included by Defendants in their proxy materials and filed with the SEC.

## VIII.   Defendants' Violations Of Section 13(d) Of The Exchange Act

112.    Defendants have violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rule 13d-1(a), Rule 13d-5(b) and Item 4 of Rule 13d-101, by failing to disclose their plans or proposals regarding the sale of Ashford Prime and its assets, including in the Schedule 13D, filed on September 2, 2015 (attached hereto as Exhibit 6), the Schedule 13D/A, filed on December 11, 2015 (attached hereto as Exhibit 7), the Schedule 13D/A, filed on January 8, 2016 (attached hereto as Exhibit 8), the Schedule 13D/A, filed on January 15, 2016 (attached hereto as Exhibit 9), the Schedule 13D/A filed February 4, 2016 (attached hereto as Exhibit 10), and the Schedule 13D/A filed February 17, 2016 (attached hereto as Exhibit 11).  Defendants also have violated Section 13(d) by failing to disclose – and continuing to deny – the formation of a group including Sessa and Livingston.

113.    In particular Item 4(b) to Rule 13d-101 require the disclosure of "any plans or proposals" relating to "[an] extraordinary corporate term, such as a merger, reorganization or liquidation."  Item 4(c) to Rule 13d-101, in turn, requires the disclosure of "[a] sale or transaction of a material amount of assets."

114.    As discussed above, Defendants failed to disclose their plans and proposals for Ashford Prime and its assets, thus violating the disclosure requirements of Items 4(b) and 4(c) to Rule 13d-101.

115.    Rule 13d-101, in turn, requires disclosure: "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."

116.    As one of Sessa's Purported Nominees, it is beyond dispute that Livingston's coordinated stock purchases with Sessa and joint agreement to take control of the Ashford Prime Board makes them part of a "group" for Section 13(d) purposes.

117.    Thus, Defendants' continued failure to disclose their formation of a group violates Section 13(d) and Rules 13d-1 and 13d-101.  To the extent that Defendants deny that their purchases were coordinated, such denial only reinforces the questions regarding potential violations of the insider trading laws.

## IX.    Defendants' Violations Of The Exchange Act Have And Will Continue To Irreparably Harm Ashford Prime And Its Stockholders

118.    Due to Defendants' violations of Section 13(d) and 14(a) and the rules and regulations promulgated thereunder, Ashford Prime and its stockholders have been, and will continue to be, irreparably harmed in the following respects:

(a)    Ashford Prime's stockholders are being deprived of the opportunity to meaningfully evaluate director nominations;

(b)    Defendants have been allowed to improperly accumulate a sizeable position in Ashford Prime's stock;

(c)    Defendants have been allowed to conceal their true intentions to force a quick sale of Ashford Prime to the detriment of Ashford Prime's stockholders; and

(d)    To ensure that Defendants do not benefit from their deception, Defendants should be required to file truthful Schedule 13D and Section 14(a) proxy solicitation materials disclosing their concealed group status and true intentions, and should be prohibited from voting any shares or proxies acquired prior thereto.

## **FIRST CLAIM FOR RELIEF**
### **(For Injunctive Relief Against Defendants For Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9)**

119.    Ashford Prime repeats and realleges the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

120.    Section 14(a) of the Exchange Act provides that it shall be unlawful for any person to solicit any proxy in violation of SEC rules or permit his name to be used in connection with such a solicitation.

121.    Rule 14a-9 provides that no solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9.

122.    Item 5(b)(1)(xii) of Rule 14a-101 provides that the participant to a solicitation shall disclose whether or not it has any arrangement or understanding with any person "with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101.

123.    The Notes to Rule 14a-9 define misleading statements under Rule 14a-9 to include "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation."

124.    Defendants violated Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 14a-9 and 14a-101, and the Note thereto, because Defendants filed false and misleading Proxy Materials or permitted their names to be used in connection with such Proxy Material.  Defendants further failed to disclose material

information necessary to make the statements made in the Proxy Materials not misleading in light of the circumstances under which they were made.

125.    Among other false and misleading statements misrepresentations and material omissions, Defendants:

(a)    failed to disclose their plans and proposals for Ashford Prime and its assets if they prevail in the proxy contest,

(b)    failed to disclose the significant economic risks to the Company and its stockholders that may arise from the realization of Defendants' scheme, including by the election of the Purported Nominees to the Ashford Prime Board or the sale of the Company and its assets, including that such events may cause the Company to pay its counterparties hundreds of millions of dollars under the Advisory Agreement and Credit Agreement,

(c)    falsely stated that the magnitude of the Termination Fee was increased by the Third Amended Advisory Agreement,

(d)    falsely claimed that Ashford Prime sold voting stock to holders of a limited partnership for $43,750, when in fact, Ashford Prime received valuable consideration in the form of amendments to the Partnership Agreement for the sale,

(e)    for several weeks, concealed Defendant Livingston's purchase of $50,000 in shares of Ashford Prime's common stock,

(f)    made false and materially misleading statements impugning the character, integrity and reputation of Ashford Prime's directors and management, and

(g)      failed to disclose that their refusal to comply with the Advance

Notice Requirements likely renders their Notice of Nomination invalid and that

their Purported Nominees may lawfully not be permitted to stand for election.

126.    The Proxy Materials were prepared, reviewed and disseminated by

Defendants.   Defendants misrepresented and omitted material facts as alleged herein.   In so

doing, Defendants made untrue statements of material facts and omitted to state material facts

necessary to make the statements that were made not misleading.

127.    By reason of the foregoing, Defendants have violated Section 14(a) and

the notes, rules and regulations promulgated thereunder, including Rules 14a-9 and 14a-101.

128.    Because of the false and misleading statements in the Proxy Materials,

Ashford Prime and its stockholders are threatened with irreparable harm.   There is no adequate

remedy at law.   Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is

corrected.

### SECOND CLAIM FOR RELIEF
**(For Injunctive Relief Against Defendants For
Violations Of Disclosure Requirements Of Section 14(a)
Of The Exchange Act And Rules 14a-3 And 14a-12)**

129.    Ashford Prime repeats and realleges the allegations contained in

paragraphs 1 through 128 as if fully set forth herein.

130.    Rule 14a-3 requires that each person solicited shall be concurrently or

previously furnished with a publicly-filed preliminary or definitive proxy statement containing

the information specified in Schedule 14A.

131.    Rule 14a-12 provides a limited exception to Rule 14a-3 in that a

solicitation may be made before furnishing a proxy statement if each written communication

includes the identity of the participants in the solicitation and "a description of their direct or

indirect interests, by security holdings or otherwise, or a prominent legend in clear, plain language advising security holders where they can obtain that information . . . ."  17 C.F.R. § 240.14a-12.

132.   Because Defendant Livingston is a participant in Defendants' proxy solicitation, Defendants were required to disclose his direct or indirect interest in Ashford Prime's common stock in their soliciting materials pursuant to Rule 14a-12.

133.   Defendants, failed to disclose Livingston's January 2016 stock purchase until February 4, 2016.  Accordingly, Defendants have violated Section 14(a) and the rules and regulations promulgated thereunder, including Rules 14a-3 and 14a-12 by knowingly or negligently making solicitations prior to February 4, 2016.

134.   Defendants' Proxy Materials are not exempt from Rule 14a-3 because such solicitations do not meet the exemption requirements under Rule 14a-12.  Defendants' Schedule 14A filings: (i) failed to include Livingston's stock purchase, and (ii) failed to include a prominent legend as described in Rule 14a-12(a)(1)(ii).

135.   By reason of the foregoing, Defendants have violated Section 14(a) and the rules and regulations promulgated thereunder, including Rules 14a-3 and 14a-12.

136.   Unless Defendants are enjoined, Ashford Prime and its stockholders will be irreparably harmed.  There is no adequate remedy at law.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

### THIRD CLAIM FOR RELIEF
**(For Injunctive Relief Against Defendants For Violations Of Reporting Requirements Of Section 13(d) Of The Exchange Act And Rule 13d-1)**

137.   Ashford Prime repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138.     Section 13(d) of the Exchange Act requires that investors acting as a group for the purpose of acquiring, holding, or voting the stock of an issuer must disclose the group's existence and make plain their intentions once group members collectively acquire the beneficial ownership of 5% percent or more of the issuer's stock.

139.     Rule 13d-1(a) provides that any person who acquires the beneficial ownership of 5% percent or more of the issuer's stock must file with the SEC within 10 days after the acquisition a statement containing the information required by Schedule 13D.

140.     Rule 13d-5(b) provides that when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of the issuer's stock, the group shall be deemed to have acquired beneficial ownership for purposes of Section 13(d) of the Exchange Act.

141.     Item 4 of Rule 13d-101 provides that the reporting person must state the purpose for acquiring the issuer's stock, including describing any plans or proposals (i) to acquire additional stock or to sell it, (ii) to engage in a "[a]n extraordinary corporate transaction, such as a merger, reorganization or liquidation," (iii) to sell or transfer a "material amount of assets" of the issuer, or (iv) for any change to the present board of directors or management of the issuer.

142.     As set forth above, Defendants' Schedule 13D and amendments thereto fail to make the full and fair disclosure required by the Exchange Act and the rules promulgated thereunder, including, but not limited to:

(a)     Failing to disclose detailed plans or proposals regarding Defendants' stated goal to sell Ashford Prime;

(b)      Failing to disclose whether Defendants intend to engage in an "extraordinary corporate" transaction, such as the merger, reorganization or liquidation of Ashford Prime;

(c)      Filing to disclose whether Defendants intend to acquire additional Ashford Prime common stock;

(d)      Failing to disclose the Livingston Stock Purchase and that Defendant Livingston and Sessa are members of a "group" pursuant to Section 13(d);

(e)      Failing to disclose that Defendants failure to comply with the Advance Notice bylaws could result in the Purported Nominees being precluded from standing for election; and

(f)      Failing to disclose any arrangements, understandings or relationships between Defendant Livingston and the other Defendants.

143.     By reason of the foregoing, Defendants violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 13d-1, 13d-101.

144.     Unless Defendants are enjoined, Ashford Prime and its stockholders will be irreparably harmed.   There is no adequate remedy at law.   Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ashford Prime respectfully requests that the Court enter judgment against Defendants as follows:

(a)     Declaring that Defendants' proxy solicitations and statements related thereto violate Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 14a-3, 14a-9, 14a-12 and 14a-101;

(b)     Enjoining Defendants from continuing to make misleading statements or omissions in their future proxy solicitations and statements related thereto;

(c)     Declaring that Sessa's Schedule 13D and the amendments thereto violate Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 13d-1, 13d-5 and 13d-101;

(d)     Ordering Defendants to correct by public means the misrepresentations and omissions in their Schedule 13D, their Proxy Materials, and the amendments related thereto and enjoining Defendants from any trading in Ashford Prime common stock until they have done so;

(e)     Enjoining Defendants from voting any shares acquired prior to the filing of true and accurate Schedules 13D and Proxy Materials;

(f)     Awarding Plaintiff Ashford Prime the costs and disbursements of this action, including reasonable attorneys' fees; and

(g)     Granting Plaintiff Ashford Prime such other and further relief as this Court may deem just and proper.

Dated:   February 25, 2016

ANDREWS KURTH LLP

By: /s/Matthew G. Nielsen
     Matthew G. Nielsen
     Texas State Bar No. 24032792
     Email:  matthewnielsen@andrewskurth.com
     Bradley W. Foster
     Texas State Bar No. 07283200
     Email: bradfoster@andrewskurth.com
     1717 Main Street, Suite 3700
     Dallas, Texas  75201
     Telephone: (214) 659-4400
     Facsimile: (214) 659-4401

Of Counsel:

CADWALADER, WICKERSHAM & TAFT LLP
Martin L. Seidel (NDTX application forthcoming)
Nathan M. Bull (NDTX application forthcoming)
Jared Stanisci (NDTX application forthcoming)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile:  (212) 406-6666
Email:  martin.seidel@cwt.com