IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASHFORD HOSPITALITY PRIME, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-CV-0527-N |
| | § | |
| SESSA CAPITAL (MASTER), LP, *et al.*, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| ASHFORD HOSPITALITY PRIME, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-CV-0713-N |
| | § | |
| SESSA CAPITAL (MASTER), LP, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

This Order addresses Sessa Capital (Master), L.P.'s ("Sessa") motion for preliminary injunction [12] and motion to amend scope of relief in Sessa's motion for preliminary injunction [86] in *Ashford Hospitality Prime, Inc. v. Sessa Capital (Master), LP*, Civil Action No. 3:16-cv-00527-N (N.D. Tex. filed Feb. 25, 2016) ("Ashford 1") and Ashford Hospitality Prime, Inc.'s ("Ashford Prime") motion for preliminary injunction [37] in *Ashford Hospitality Prime, Inc. v. Sessa Capital (Master), LP*, Civil Action No. 3:16-cv-00713-N (N.D. Tex. removed Mar. 14, 2016) ("Ashford 2"). The Court grants Ashford Prime's motion for preliminary injunction and denies Sessa's motions.

ORDER – 1

# I. ORIGINS OF THE DISPUTE

## A. Ashford Prime Adopts the Third Amended and Restated Advisory Agreement

Ashford Prime is a publically-traded corporation that is based in Dallas and organized under the laws of Maryland. *See* Ashford Prime's Br. in Supp. of Mot. for Prelim. Inj. 4 [38], in Ashford 2 ("Ashford Prime's Mot. for Prelim. Inj."). The corporation invests in the hotel industry. *See* Sessa's Mem. of Law in Supp. of Mot. for Prelim. Inj. 2 [13], in Ashford 1 ("Sessa's Mot. for Prelim. Inj."). Apparently there was unrest among the stockholders of Ashford Prime regarding the company's management because at the 2014 annual meeting, the stockholders recommended that Ashford Prime's board opt out of the Maryland Unsolicited Takeover Act ("MUTA"). *See id.* Ashford Prime's board opposed this recommendation, but eventually complied a year later. *See id.*

A few weeks after it opted out of MUTA, the board, with the support of the independent directors, approved the Third Amended and Restated Advisory Agreement (the "TARAA") between Ashford Prime, Ashford Inc., Ashford LLC, Ashford OP, and Ashford Prime TRS Corporation. *See* Ashford Prime's Mot. for Prelim. Inj. 4. In the TARAA, Ashford Prime agreed that if stockholders voted to replace a majority of the board with nominees not approved by the current directors, Ashford's advisors could terminate the agreement and force Ashford Prime to pay a termination fee (the "Proxy Penalty"). Sessa's Mot. for Prelim. Inj. 5. The termination fee is enormous, especially when compared with Ashford Prime's market capitalization. Ashford Prime has stated that it believes the termination fee to be in the "hundreds of millions of dollars." *Id.* Ashford Prime's market

capitalization is approximately $300 million.  *Id.*  In exchange for the termination fee amendment, Ashford Prime received concessions from its advisors, including the following: (1) the term of the advisory agreement was shortened; (2) the base fee payable to the advisors was adjusted; and (3) the advisors agreed to make "key money investments" in Ashford Prime to support certain acquisitions.  *See* Ashford Prime's Resp. 6 [37], in Ashford 1.

### B. Sessa Vies for Control

Sessa is a member of the web of companies and partnerships that comprise the New York-based hedge fund managed by John Petry.  *See* Ashford Prime's Mot. for Prelim. Inj. 4.  Sessa owns approximately 8.2 percent of Ashford Prime's outstanding common stock. *Id.* at 7.  Sessa advised Ashford Prime that it intended to nominate five candidates to Ashford Prime's seven member board.  *See* Sessa's Mot. for Prelim. Inj. 8.  Ashford Prime's bylaws require that potential nominees fill out a questionnaire that "include[s] all information relating to the Proposed Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Proposed Nominee as a director in an election contest."  *See id.* at 7.  Sessa completed the questionnaires, but failed to answer all of the questions fully.  *Id.*  Sessa requested that the Ashford Prime board approve the Sessa candidates so that their election to the board would not trigger the Proxy Penalty in the TARAA.

### C. The Ashford Prime Board Further Entrenches Itself

Rather than approve the Sessa candidates so that their nomination to the board would not trigger the Proxy Penalty, the Ashford Prime board launched a campaign against the Sessa candidates, warning voters that electing them to the board would "allow Ashford LLC

to terminate the advisory agreement and require the Company to pay a substantial termination fee to Ashford LLC upon such termination." *See* Sessa's Mot. for Prelim. Inj. 9. This campaign apparently is having an effect. At least one analyst has advised that in light of the Proxy Penalty, "shareholders would be best served by voting against Sessa's nominees." *Id* at 10.

Ashford Prime's board filed a preliminary proxy stating that "the nominees set forth in Sessa's proxy materials cannot properly be brought before the annual meeting of stockholders" and Ashford Prime does "not intend to count any stockholder votes for Sessa's proposed nominees." Ashford Prime's Resp. to Sessa's Mot. to Amend Scope of Relief. 3 [102], in Ashford 1. Ashford Prime's board claims that Sessa's responses to the questionnaires for each of its nominees is deficient. *See* Ashford Prime's Mot. for Prelim. Inj. 7. Moreover, the board initiated an independent investigation into the Sessa candidates and found that Philip B. Livingston, one of Sessa's nominees, purchased approximately $40,000 in shares of Ashford Prime's common stock in January, 2016. *Id.* at 8. The board concluded that Livingston and Sessa had formed a "group" as it is defined in Section 13(d) of the Securities Exchange Act of 1934. *Id.* Ashford Prime also claims that Livingston engaged in resume padding by stating he was a Certified Public Accountant ("CPA"). *See id.* Livingston was formally a CPA, but he has let his certification lapse. *See id.*

### D. The Parties Seek Judicial Relief

Ashford Prime filed two lawsuits against Sessa, Sessa Capital GP, LLC, Sessa Capital IM, L.P., Sessa Capital IM GP, LLC, John E. Petry, Livingston, Lawrence A. Cunningham, Daniel B. Silvers, and Chris D. Wheeler, one in federal court and one in Texas state court.

Ashford Prime's Original Pet. 1 [1–5], in Ashford 2; Ashford Prime's Compl. 1 [1], in Ashford 1. Sessa removed Ashford 2 from the state court to this Court. Sessa's Notice of Removal 1–2 [1], in Ashford 2. Sessa moved the Court for a preliminary injunction in Ashford 1, seeking relief that would require the Ashford Prime board to approve the Sessa candidates so that they could participate in the proxy contest. *See* Sessa's Mot. for Prelim. Inj. 23. Ashford Prime moved the Court for its own preliminary injunction in Ashford 2, seeking an order (1) finding that Sessa's slate of nominees is invalid and ineligible to stand for election to the board because of their failure to comply with the advance notice requirements in the bylaws; (2) enjoining Sessa from submitting its nominees to Ashford Prime shareholders for election; and (3) enjoining Sessa from soliciting proxy votes for its nominees or distributing any proxy materials regarding the nominees. Ashford Prime's Mot. for Prelim. Inj. 25.[1]

## II. THE COURT APPLIES MARYLAND'S BUSINESS JUDGMENT RULE

Sessa argues that "in Maryland, the business judgment rule does not apply when stockholders are directly injured by the actions of a board." *See* Sessa's Mot. for Prelim. Inj. 16. Sessa bases this argument on *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408 (2009). However, in *Shenker* the Court of Appeals of Maryland, Maryland's highest court, held that "the business judgment rule applies to all decisions regarding [a] corporation's management." *Shenker*, 983 A.2d at 424. Moreover, the Maryland Code of Corporations and Associations states: "[a]n act of a director relating to or affecting an acquisition or a potential acquisition

---

[1]Sessa filed a motion to amend the scope of relief in its motion for preliminary injunction. Mot. to Am. Scope of Relief in Sessa's Mot. for Prelim. Inj. [86], in Ashford 1. Sessa seeks to add several new requests for relief to its motion for preliminary injunction.

of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director." MD. CODE ANN., CORPS. & ASS'NS § 2-405.1. The court in *Shenker* found that this statute was meant to reject "in Maryland the heightened scrutiny imposed on directors of Delaware corporations in hostile takeover situations by the Delaware Supreme Court in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)." *Shenker*, 983 A.2d at 427. The court acknowledged that this was "a relatively rare rejection in Maryland of Delaware's acknowledged leadership in developing a coherent body of corporate law to which we and many other states ordinarily look for guidance [in matters of corporate law]." *Id.*

*Shenker* stands for the proposition that once a "threshold decision to sell" a company has been made, a board owes "fiduciary duties of candor and maximization of shareholder value to [shareholders], common law duties not encompassed or superseded by § 2–405.1(a)." *Id.* at 422. Notably, however, the Maryland legislature apparently found even these modest common law duties to be unfavorable. It has since amended the Maryland Code of Corporations & Associations § 2-405.1 to provide that, even in the context of selling the company, courts will review directors' decisions only under the Maryland business judgment rule. "[This section is] the sole source of duties of a director to the corporation or the stockholders of the corporation . . . ." 2016 Md. Laws Ch. 170 (S.B. 148). This amendment takes effect in Maryland on October 1, 2016. *Id.* Accordingly, the Court applies

ORDER – 6

the business judgment rule when reviewing decisions regarding a corporation's management.[2]

In Maryland "the business judgment rule . . . insulat[es] the business decisions made by [directors] from judicial review, absent a showing of fraud, self-dealing, unconscionable conduct, or bad faith. *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 424 (Md. 2009); *see also N.A.A.C.P. v. Golding*, 679 A.2d 554, 559 (Md. 1996) ("The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith."). The Supreme Court of Delaware explained that when applying the business judgment rule, courts should determine whether there is "any rational business purpose" for a board's decision. *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 46 n.17 (Del. 1994). The rationale for this rule is

> [a]lthough directors of a corporation have a fiduciary relationship to the shareholders, they are not expected to be incapable of error. All that is required is that persons in such positions act reasonably and in good faith in carrying out their duties. . . . Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence.

*N.A.A.C.P.*, 679 A.2d at 559.

Overcoming the business judgment rule is difficult. "Under the Business Judgment Rule, there is a presumption that directors of a corporation acted in good faith and in the best interest of the corporation." *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. 1998). And "the party challenging the validity of a board's actions must produce evidence sufficient to rebut

---

[2]The Court does not necessarily endorse this result, but that choice is up to Maryland.

ORDER – 7

this presumption." *Id.* "It is well established that courts generally will not interfere with the internal management of a corporation." *Shenker*, 983 A.2d at 424 (internal punctuation and citation removed). One way to overcome the business judgment rule is to show that the directors acted in bad faith. A movant can demonstrate the bad faith of the board by providing evidence that "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *9 (Del. Ch. 2011). A movant can also show bad faith by demonstrating that a "fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *7 (Del. Ch. 2013).

### III. THE COURT DENIES SESSA'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTS ASHFORD PRIME'S MOTION FOR PRELIMINARY INJUNCTION

#### A. Legal Standard for Preliminary Injunction

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris Cty. v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the preliminary injunction is denied; (3) that the potential injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) that granting the preliminary injunction will not disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

### B. Ashford Prime Is Likely to Succeed

Sessa claims that the Ashford Prime board is breaching its fiduciary duties by using the advance notice bylaws to prevent Sessa from putting up its candidates for election at Ashford Prime's annual meeting. *See* Sessa's Mot. for Prelim. Inj. 12–16, 18–20. As discussed above, the Court reviews Ashford Prime's board's decision to withhold approval of Sessa's candidates under Maryland's business judgment rule.

The advance notice provisions of Ashford Prime's bylaws require those seeking nomination to the board to provide "all information relating to the Proposed Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Proposed Nominee as a director in an election contest." *Id.* at 7. The Security Exchange Act of 1934 requires potential nominees to "[d]escribe any plans or proposals" that would result in a sale or transfer of material assets, any extraordinary corporate transaction, any other material change to the corporate structure, or any similar action. *See* 17 C.F.R. § 240.13d-101.

The Sessa candidates claim that they have no plans for Ashford Prime if they take control of the board, and they refused to provide any substantive answers to questions about their plans. They maintain this position despite the existence of correspondence that reveals discussions at Sessa about how to amend Ashford Prime's bylaws and stop acquisitions,

ideas for a litigation strategy with regard to the Proxy Penalty; and details of a "gameplan" for selling the company. *See* Ashford Prime's Reply 5–6 [77], in Ashford 2. For example, during a phone call between Petry and the Sessa candidates, Livingston stated that he "would be interested in what would be the gameplan after election." App. in Supp. of Ashford Prime's Reply, Ex. K, 620 [77-3], in Ashford 2. Petry responded by explaining that he would want to maximize value, and in today's environment that would mean having a "real and fair sale process." *Id.* Petry added that first they would need to deal with the Proxy Penalty. *Id.* Moreover, in an email to his employees, Petry explained his thoughts about convincing Institutional Shareholder Services Inc. (ISS) to recommend to shareholders to vote for Sessa's nominees. One of his comments was that it would be important to present ISS with a plan such as "internalizing, amending bylaws, stopping acquisitions." *Id.* Ex. O, 633. Petry believed the "big ISS hurdle" would be having "a plan for the termination fee." *Id.* at 635. One Sessa employee wrote to Petry, "I do think, though, that we need to have a gameplan if were to get involved [with Ashford Prime]." *Id.* Ex. P, 637.

When the board determined that the Sessa candidates' responses to the questionnaires were deficient, it offered the candidates a chance to amend their answers. The Sessa candidates refused. Ashford Prime's Mot. for Prelim. Inj. 12. The board apparently does not believe that a sophisticated hedge fund would engage in expensive litigation and a difficult proxy contest without any plans for the company after it seized control. In light of the evidence supporting the board's contention that Sessa has plans for Ashford Prime after it assumes control of the board, the board could rationally believe the Sessa candidates had a

plan they refused to disclose in their questionnaires and thus were ineligible. The Court concludes that the business judgment rule protects Ashford Prime's board's decision to deny approving the Sessa candidates for the proxy contest and election. Thus, the Sessa candidates failed to show a substantial likelihood that they will ultimately prevail on the merits. Accordingly, the Court denies Sessa's motion for preliminary injunction.[3] Conversely, Ashford Prime is likely to succeed on the merits.[4]

### C. The Other Factors Favor Ashford Prime's Motion for Preliminary Injunction

As discussed above, the Ashford Prime board has reasonably determined that the Sessa candidates are ineligible. Allowing the Sessa nominees to stand for election or solicit proxy votes or distribute proxy materials regarding the nominees when they are ineligible will cause Ashford Prime irreparable injury. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 (1970); *see also Lichtenberg v. Besicorp Grp. Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (finding that forcing shareholders to vote on the basis of a materially misleading proxy "establishes the irreparable harm sought to be prevented by § 14(a) of the [Securities Exchange Act]"). The Court concludes that the balance of the hardships weighs in favor of granting Ashford Prime's preliminary injunction because allowing Sessa to solicit proxies could potentially cause Ashford Prime's shareholders to cast meaningless votes for invalid

---

[3]In light of the Court's denial of Sessa's motion for preliminary injunction, the Court denies as moot Sessa's motion to amend scope of relief in Sessa's motion for preliminary injunction.

[4]Because the Court concludes that Ashford Prime is likely to prevail on this claim, it does not address Ashford Prime's other arguments regarding the Sessa candidates' failure to disclose a group and Mr. Livingston's resume padding and failure to disclose his purchase of Ashford Prime stock in January.

nominees. Finally, the Court concludes that granting the preliminary injunction is in the public interest because an injunction will diminish shareholder confusion at the annual meeting. Accordingly, the Court grants Ashford Prime's motion for preliminary injunction.

## CONCLUSION

The Court denies Sessa's motion for preliminary injunction. In light of this denial, the Court denies as moot Sessa's motion to amend scope of relief in Sessa's motion for preliminary injunction. The Court grants Ashford Prime's motion for preliminary injunction as follows: (1) Sessa's slate of candidates is invalid and ineligible to stand for election to Ashford Prime's board at the 2016 annual meeting because of the board's finding that the candidates' failed to comply with the advance notice requirements in submitting nomination materials; (2) the Court enjoins Sessa, or any person acting in active concert with Sessa, from submitting or purporting to submit Sessa's candidates to Ashford Prime's shareholders for election to the board for its 2016 annual meeting; (3) the Court enjoins Sessa, or any person acting in active concert with Sessa, from soliciting proxy votes for Sessa's candidates or distributing any proxy materials regarding Sessa's candidates.

Pursuant to Federal Rule of Civil Procedure 65, the preliminary injunction is valid only if Ashford Prime gives security in the amount of $100,000, an amount the Court considers proper to pay the costs and damages sustained by Sessa if it is found to have been wrongfully enjoined. FED. R. CIV. P. 65.

ORDER – 12

Signed May 20, 2016.


_____
David C. Godbey
United States District Judge

ORDER – 13